## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR A SEARCH WARRANT FOR:<br><br>ZTE Cellphone, Model: Z982, S/N: 320177167373<br><br>ZTE Cellphone, Model: Z855, S/N: 865882032191400 | Mag. No. |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Robert Graves, Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— two digital devices, which are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since January 2015.  I am currently assigned to the FBI's Violent Crime Task Force, which is responsible for investigating violent crime and major offenders in Washington D.C. During the course of my

participation in law enforcement, I have conducted arrests, and executed search warrants and court orders. I have investigated crimes involving bank robberies, armored car robberies, Hobbs Act violations, extortion/threats, and kidnappings.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

3.      Based on my experience and training, I am aware that:

a.      Those involved in robbery and theft offenses often use cellular telephones or other electronic devices to facilitate the planning and execution of their criminal activities, including the text messaging features of their cellular telephones to further conceal their communication from law enforcement.  These individuals may periodically discontinue use of their telephones, acquire new cellular telephones to facilitate their criminal activities in order to thwart detection by law enforcement, and use and maintain multiple telephones subscribed in either their true or fictitious names;

b.      Individuals involved in robbery and theft offenses use cellular telephones to take, or cause to be taken, photographs of themselves, their associates, and property they have stolen, including U.S. currency;

c.      Individuals engaged in robbery and theft offenses often keep address and/or telephone books, reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, including computerized or electronic address and telephone records, of their associates; and these address or telephone books can often be found on their cellular telephones or other electronic devices;

d.      Electronic devices can store information for long periods of time and even when a user deletes information from a device; it can sometimes be recovered using forensics tools.

4.      The statements contained in this affidavit are based in part upon information provided to me by other agents of the FBI, officers of the Metropolitan Police Department (MPD), review of video surveillance footage, and the results of the execution of a search warrant. Based on your affiant's participation in this investigation, as well as through interviews with and analysis of reports submitted by other agents of the FBI and MPD who are involved in this investigation, I am familiar with all aspects of this investigation. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to obtain a search warrant for the cellular telephones referenced *infra*.

5.      On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that there is probable cause to believe that ARNOLD BOON, and others known and unknown, have participated in offenses involving robbery, theft, and destruction of property, and conspiracy to do the same in violation of 18 U.S.C. §§ 1951, 2113(a), and D.C. Code § 22-303. Specifically, there is probable cause to believe that the cellular telephones described in paragraph 6 *infra*, contain evidence and instrumentalities of violations of the aforementioned offenses, as more fully described in **Attachment B**.

6.      Your Affiant requests a search warrant to search:

(a).    **ZTE Cellphone**
        **Model Z982, S/N 320177167373**

(b).    **ZTE Cellphone**

**Model Z855, S/N 865882032191400**

Items (a) and (b) are phones seized during the execution of a search warrant at 38 Galveston Street, Southwest, Apartment 102, Washington, D.C., on March 17, 2018 (hereinafter referred to as the "target devices").  The target devices are currently located at the Metropolitan Police Department's (MPD) Evidence Control Branch located at 17 DC Village Lane, S.W., Washington, D.C.

## PROBABLE CAUSE

7.      On January 19, 2018, at approximately 1:30 a.m., officers of MPD received a 911 call for destruction of property and theft at the 7-11 convenience store located at 218 Cedar Street, N.W., Washington, D.C.  Upon arriving at the scene, officers observed that a portion the front of the 7-11 store had been destroyed by a vehicle crash, and that the ATM from the store had been stolen.  Officers obtained surveillance video from the 7-11, which showed that at approximately 1:30 a.m., a dark 2004 Ford F-250 pickup truck bearing D.C. tag DR 4616, backed through the front wall of the 7-11 convenience store, knocking over the ATM located inside. The video revealed that the unidentified male driver of the truck, and two more unidentified male subjects entered the 7-11, loaded the ATM onto the bed of the pickup truck, and fled the scene. It was later learned through eyewitness statements that a fourth subject was observed driving a dark sedan in the vicinity of the 7-11, and that a short distance away the driver of a dark sedan exited the vehicle and assisted the three subjects from the truck load the ATM into the sedan.

8.      The 7-11 video surveillance footage showed two subjects (S-1 and S-2) walking up toward the entrance door of the 7-11 as the pickup truck, driven by S-3, backed towards a glass covered portion of the front of the building. The pickup truck backed through the store, while S-1 and S-2 entered through the front entrance. S-1 and S-2 immediately attempted to place the ATM

into the bed of the pickup truck, however, after several unsuccessful attempts; S-3 exited the pickup truck and assisted S-1 and S-2 in placing the ATM onto the bed of the truck.

9.      S-1 was wearing a dark colored Helly Hansen Jacket with a hood and florescent stripe on the back, blue gloves, black ski mask, black Helly Hansen pants, purple foamposite sneakers, a shiny colored object on his left wrist, and white socks. S-2 was wearing a black ski mask, black hoodie, dark pants, black gloves, and black shoes. S-3 was wearing a black ski mask, light colored gloves, black trench coat style Helly Hansen jacket, and dark pants.  Video footage revealed that while S-1 and S-2 attempted to place the ATM into the truck, the shiny object that was on S-1's left wrist fell to the floor. Police later recovered a gold colored Citizens watch in the area where video footage showed the shiny object to have fallen off S-1's wrist. Police recovered a swab of blood from the gold watch, which was later submitted to the Combined DNA Index System (CODIS), and resulted in a match to the DNA profile of Arnold S. Boon, also known as "Armond Shantrelly Boone."

10.      As a result of this investigation, a Superior Court of the District of Columbia Search Warrant was obtained for Boon's residence located at 38 Galveston Street, S.W., Apartment 102, Washington, D.C., as well as an arrest warrant for Boon for participating in the 7-11 ATM robbery on January 19, 2018.  On March 17, 2018, officers of the MPD executed the search warrant. During the search warrant, which also authorized the seizure of cellular telephones, police seized evidence including a loaded .45 semi-automatic pistol, an extended magazine containing additional .45 ammunition, and the target devices.  On March 27, 2018, Boon was indicted in the United States District Court for the District of Columbia for Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding

One Year, in violation of Title 18 U.S.C. § 922(g)(1).  On April 23, 2018, a superseding indictment was returned against Boon charging him with three additional counts of Conspiracy to Interfere with Interstate Commerce by Robbery, Interference with Interstate Commerce by Robbery, and Bank Robbery, in violation of 18 U.S.C. §§ 1951 and 2113(a).

## **TECHNICAL TERMS**

11.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning

system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data

security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

12.    Based on my training, experience, and research, I know that the target devices have the capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

13.    As described above and in Attachment B, this application seeks permission to search for information that might be found within the Devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is

probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

a.  Individuals who engage in criminal activity, including robbery and theft offenses use digital devices, like the target devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the target devices, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; and records of financial transactions related to the illegal conduct, including transfer and disposition of proceeds of illegal activity.

b.  Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage

medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

14.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-

virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

15.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled

environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.

Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance

from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.    The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

## **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

16.      Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

17.     Based on the all of the forgoing information presented in this affidavit, your affiant submits that there is probable cause to believe that ARNOLD BOON, and others both known and unknown have participated in offenses involving robbery, theft, and destruction of property, and conspiracy to do the same, in violation of 18 U.S.C. §§ 1951, 2113(a), and D.C. Code § 22-303, and that stored within the electronic memory and files of the target devices are evidence and instrumentalities of that conspiracy, as set forth more fully in Attachment B of this affidavit in support of an application for the issuance of the search warrant, which is hereby incorporated by reference herein.


_____
Robert Graves
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____


_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE